ENVIRONMENTAL DEFENSE FUND, INC., Chesapeake Bay Foundation, Inc., Plaintiffs,

and

Commonwealth of Virginia, ex rel. State Board of Health, State Health Commissioner, Plaintiff-Intervenor, Appellees,

v.

James LAMPHIER, Mrs. James (Janet A.) Lamphier, Defendants, Appellants.

No. 82–1631.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 9, 1983.

Decided Aug. 4, 1983.

Richard R. Nageotte, Woodbridge, Va. (Nageotte, Borinsky & Zelnick, Woodbridge, Va., on brief), for appellants.

Timothy G. Hayes, Environmental Defense Fund, Patrick A. O'Hare, Sr. Asst. Atty. Gen., Richmond, Va. (Jeter M. Watson, Chesapeake Bay Foundation, Ashland, Va., on brief), for appellees.

Before WINTER, Chief Judge, and MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

The cause of this appeal is a judgment by the district court holding that the defendants violated state and federal antipollution laws and committed a common law nuisance. We discern no merit in the assorted contentions on appeal, and accordingly we affirm.

## I.

James and Janet Lamphier are co-owners of a farm in Culpeper County, Virginia. Since 1974 the farm has been headquarters for "Jim's Liquid Waste," a sole proprietorship belonging to James Lamphier and engaged in the business of industrial waste disposal.

In the fall of 1979, the Virginia State Water Control Board ("SWCB") and the State Department of Health ("SDH")[1] learned that Lamphier was transporting various wastes to his farm and disposing of them by land application and lagooning of bulk liquids, and burial of drummed liquids. After visits to the farm, both state agencies ordered Lamphier to cease his disposal activities. On December 5, 1979, the SWCB issued an emergency order requiring Lamphier to contain all runoff from lagoons and land application areas and submit a list of wastes deposited at the facility. Subsequently, the SWCB ordered Lamphier to devise a land reclamation plan and to construct proper facilities for the disposal of septic wastes. In compliance with these orders, Lamphier halted dumping activities (although he continued to receive shipments of wastes through March, 1980) and, sometime after November 5, 1980, submitted a plan for waste containment and land reclamation to both the SWCB and the SDH. The SWCB subsequently approved the plan, but the SDH did not.

---

1. The SDH has responsibility for local regulation of hazardous wastes in conformity with the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* The SDH also enforces state waste disposal laws. *See* Va.Code §§ 32.1–177 *et seq.* The primary responsibility of the SWCB, on the other hand, is the protection of the state's groundwaters from contamination in all forms. *See* Va.Code §§ 62.1–44.2 *et seq.* Thus, compliance with SWCB requirements does not necessarily satisfy SDH requirements. For example, only the SDH has jurisdiction over drummed wastes, the subject of the dispute in this case.

In March, 1980, an investigator for the SDH visited the Lamphier farm and found several 55-gallon drums containing solvents buried on the property. On April 11, 1980, the SDH investigator returned along with a special agent of the state police and, armed with a search warrant, collected samples of well waters and of wastes found in numerous barrels. Tests performed on these samples revealed a high degree of flammability, which under regulations of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 et seq., qualified the wastes as hazardous. See 40 C.F.R. § 261.21.

At about the same time, William Gilley, director of SDH's Division of Solid and Hazardous Waste, wrote Lamphier that disposal of flammable solvents was a violation of state law. Lamphier did not respond to Gilley's request for information pertaining to the nature and origin of the wastes.

On April 28, 1980, Lamphier's attorney, Richard Nageotte, requested by letter a meeting with Gilley at the SDH. Gilley did not respond. On May 9, 1980, Nageotte again wrote Gilley, asserting that the drummed solvents were not harmful, but that nevertheless he had advised Lamphier to dig up the drums and place them in a "covered area." The SDH never approved of (nor objected to) this action.

On June 16, 1980, federal officials intervened. Representatives from the Environmental Protection Agency ("EPA") visited the farm to ascertain whether the materials posed an "imminent hazard" warranting immediate action under § 7003 of RCRA, 42 U.S.C. § 6973. Samples taken revealed no imminent hazard, but in the report to the SWCB, Jack Brinkmann of the EPA left open the possibility that other RCRA violations might be present.

On August 19, 1980, the notification requirements of RCRA, 42 U.S.C. § 6930, went into effect. As of that date, all operators of waste disposal sites were required to notify the EPA of their activities. After August 19, 1980, no hazardous waste could be stored lawfully unless notification had been given. Lamphier never filed formal notification with the EPA.

On November 5, 1980, a meeting was held between Nageotte and representatives of the SWCB, the SDH, and the EPA. Lamphier's proposal for refurbishing the waste disposal operation was rejected by the agency representatives as unsatisfactory under RCRA. The SWCB then assumed responsibility for supervising a plan to reclaim the land. Shortly thereafter a formal reclamation plan was submitted by Lamphier and accepted by the SWCB. The SDH also reviewed the plan but neither approved nor rejected it. Reclamation was begun and some of the bulk wastes neutralized. However, a large number of 55-gallon drums containing waste liquids remained on the land, and these liquids became the source of the controversy in this litigation.

On November 19, 1980, major new RCRA provisions went into effect, requiring all hazardous waste treatment, storage and disposal facilities to register for permits or non-permit interim status and to comply with certain operating standards. Lamphier took no action to obtain an operator's permit.

On February 19, 1981, Gilley wrote Lamphier on behalf of the SDH and EPA regarding RCRA permit requirements, advising Lamphier to remove all drummed wastes still stored at the farm to a properly registered facility.

Nageotte responded to Gilley on February 27, 1981, that the material contained in the drums was "nothing more than solvents" which he opined were not hazardous. Furthermore, stated Nageotte, the barrels were being held at the direction of the SDH; therefore, the SDH should assume responsibility for obtaining the necessary permits.

In a letter dated March 16, 1981, Gilley reiterated RCRA requirements, noting that SDH lab tests had shown the materials to be hazardous. He also asserted that SDH had not ordered continued storage of the barrels on Lamphier's property; rather, statements by SDH representatives to Lamphier's employees on earlier occasions were

made in the context of preventing disposal of the drummed fluids on the farm in a manner inconsistent with state regulations.

On June 5, 1981, Gilley sent Lamphier a copy of the Virginia Hazardous Waste Management Regulations and the RCRA notification form, again urging compliance with federal and state law. Nageotte wrote Gilley on June 26, 1981, that all the material contained in the barrels had been incinerated, on Nageotte's advice, and that therefore a storage permit was no longer required.

Gilley answered in letters dated July 14 and 30 that Lamphier's unauthorized incineration of the waste solvents was an apparent violation of state and federal law, and that he was notifying the EPA of the matter.

The Environmental Defense Fund, Inc. ("EDF") and the Chesapeake Bay Foundation ("CBF"), two private environmental groups, joined the dispute on October 5, 1981, by filing a complaint against Lamphier under the "citizen suit" provision of RCRA, 42 U.S.C. § 6972, alleging violations of RCRA notification and permit requirements, 42 U.S.C. §§ 6930 and 6925. The Commonwealth of Virginia intervened on January 12, 1982, appending several state law charges to EDF and CBF's action. In addition to injunctive relief, the Commonwealth sought response costs under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.*

After a bench trial, the court found the defendants guilty of common law nuisance and of violations of RCRA and Virginia state law. As relief, the court issued an injunction ordering Lamphier henceforth to comply with applicable hazardous waste regulations. The court further ordered the Lamphiers to provide the plaintiffs and plaintiff-intervenors access to the farm for the purpose of monitoring wastes. Fees and costs were also awarded.

**2.** References to Lamphier are intended to encompass both defendants.

**3.** RCRA regulations also explicitly prohibit "open burning" of hazardous wastes, defined at

## II.

Lamphier's[2] first contention on appeal is that the prohibitions of RCRA do not apply to him.

Under 42 U.S.C. § 6925, anyone "owning or operating a facility for the treatment, storage, or disposal of hazardous waste" as of November 19, 1980, must obtain operating permits from the EPA. Lamphier attempts to argue that because no wastes were brought to the farm after March, 1980, and because the barrels on the property remained there only by order of the SDH, Lamphier cannot be considered to have been "operating a facility for the treatment, storage, or disposal of hazardous waste" as of November 19, 1980, the date section 6925 came into effect.

"Storage" of wastes is defined at 40 C.F.R. § 260.10 as "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere." Lamphier's contention that no wastes were brought in after March, 1980, is thus immaterial where he continued to store substances deposited at the farm prior to that date. At trial, William Gilley testified that SDH had never ordered Lamphier to hold the barrels at the farm, and the district court so found. This finding is supported by a letter dated March 16, 1981, from Gilley to Nageotte in which Gilley states that Lamphier "was and is free to dispose of this material elsewhere in a manner consistent with federal EPA regulations at specifically permitted sites." Moreover, by burning the wastes in early 1981, Lamphier "treated" them, *see* 40 C.F.R. § 260.10, without notifying EPA or obtaining a permit from EPA as required under 42 U.S.C. §§ 6930 and 6925.[3]

Operators who generate less than one thousand kilograms of hazardous waste per month are exempt from the permit and

40 C.F.R. § 260.10 as the combustion of material without proper control of emissions. Lamphier's wastes were incinerated in open barrels. *See also* 40 C.F.R. § 265.382.

notification requirements of 42 U.S.C. §§ 6925 and 6930. 40 C.F.R. § 261.5. Lamphier asserts that he falls within this exemption because the quantity of material stored and eventually incinerated on his property was less than one thousand kilograms.

The plaintiffs respond, and we agree, that Lamphier cannot avail himself of the "small generator" exemption because he is not a generator at all under 40 C.F.R. § 260.10. Section 260.10 defines generators as persons who either produce hazardous wastes "or whose act first causes a hazardous waste to become subject to regulations." Lamphier falls in neither category. The materials found on his property were neither produced by him nor separated by him from harmless compounds. See 45 Fed. Reg. 77024 (1980). Lamphier simply provided a receptacle for existing wastes. In short, Lamphier cannot escape the reach of 42 U.S.C. §§ 6925 and 6930.

■ Lamphier next argues that, assuming he was covered by RCRA, he met the requirements of sections 6925 and 6930 by opening his farm to inspection by the EPA on June 16, 1980. That inspection, claims Lamphier, provided EPA with all the information required under the notification and permit law, and after June 16, no activities were conducted on the property that would have required a permit or non-permit interim status.

There are several problems with this argument. First, the statute does not provide for constructive notification. The formal procedure for notifying the EPA of hazardous waste activities and for applying for permits is clearly set out at 45 Fed.Reg. 12746 (1980) and at 40 C.F.R. §§ 122.4, 122.-22 and 122.24. The detailed disclosures and attestations required under these regulations go far beyond the scope of the EPA's field investigation of June 16, 1980, the purpose of which was merely to determine whether the wastes at Lamphier's farm posed an imminent hazard. Furthermore, Lamphier had ample notice that regulatory authorities viewed him to be in noncompliance with the notification and permit law.

Director Gilley of the SDH, which has responsibility for local enforcement of RCRA, repeatedly wrote Lamphier that he was in violation of the notification and permit provisions of the statute. Gilley even went to the trouble of providing the necessary forms for Lamphier to complete.

The contents of the reclamation plan filed by Lamphier with the SWCB after November 5, 1980, also fall short of the notification requirements of 42 U.S.C. § 6930. In any event, the SWCB's jurisdiction differs from that of the EPA and SDH, so those two agencies are not estopped from asserting that Lamphier violated their regulations. Furthermore, Lamphier's reclamation plan dealt only with soil recovery and groundwater protection on the site of septic tanks, lagoons, and land repositories; it did not address the disposal of the sealed barrels of waste, which was the particular concern of the EPA and SDH.

Thus, Lamphier has indisputably violated federal law.

### III.

■ Originally, the EDF and CBF sought civil penalties against Lamphier of $25,000 for each day of violation under the citizen suit provision of RCRA, 42 U.S.C. § 6972. However, at trial, the plaintiffs voluntarily dismissed this claim, limiting the remedy sought to an injunction, plus costs and attorneys fees.

Lamphier maintains that once plaintiffs waived their original claim for civil penalties, no jurisdiction remained over claims for statutory and common law injunctive relief, since the citizen suit provision of RCRA, 42 U.S.C. § 6972, does not expressly authorize such relief. Lamphier cites Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623–2624, 69 L.Ed.2d 435 (1981), for the proposition that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." In Sea Clammers, a private association brought a claim seeking damages and declaratory and

injunctive relief under the citizen suit provision of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1365(a), and federal common law. Section 1365(a) authorizes citizen suits against any person alleged to be in violation of an effluent standard or a government order under the Act and confers on the district court jurisdiction to enforce such standards or orders and to impose any appropriate civil penalties. The question before the Court was whether section 1365(a) additionally permitted suits for private relief—damages and an injunction—as opposed to "private attorneys general" actions to obtain enforcement of federal law through injunctive relief and civil penalties. The Court held that the plain language of the FWPCA did not authorize a private right of action for injunctive and monetary relief. Although 33 U.S.C. § 1365(a) enumerates only civil penalties, the Court presumed the statute authorized private persons to sue for civil injunctions to enforce the regulatory scheme, provided the private plaintiff complied with the notice requirements set out in section 1365(b). But the plaintiffs in *Sea Clammers* ignored these procedures and thus forfeited their claim for injunctive relief as well as losing their quest for a private award of damages.

*Sea Clammers* is readily distinguishable from the instant case. The private plaintiffs here did not seek an award of damages but rather acted as private attorneys general in seeking the assessment of civil penalties and an injunction against Lamphier. Under the citizen suit provision of RCRA, 42 U.S.C. § 6972, the district court is authorized to enforce RCRA regulations or orders, presumably to the full extent of its legal and equitable powers. 42 U.S.C. § 6972(a). Provided plaintiffs are genuinely acting as private attorneys general rather than pursuing a private remedy, nothing

in RCRA, as in the FWPCA, bars injunctive relief. *See* 42 U.S.C. § 6928.[4]

Lamphier next contends that Virginia's hazardous waste statute, Va.Code §§ 32.1–177 *et seq.*, preempts the state's common law of nuisance, just as in *Sea Clammers* it was held that the Federal Water Pollution Control Act superseded the federal common law of nuisance. Lamphier cites no Virginia authority in support of this proposition, and the federal analogy will not sustain him, for in *Hannabass v. Ryan*, 164 Va. 519, 180 S.E. 416 (1935), the Supreme Court of Virginia held that unless the intention of a statute to change the common law appears from its express language or by necessary implication, the statute is to be read as if the common law remained unchanged. Lamphier has failed to pinpoint language in Va.Code §§ 32.1–177 *et seq.* that either expressly or impliedly amends the common law.

## IV.

Lamphier next attacks the award of injunctive relief requiring future compliance with the registration requirements of RCRA and directing that Lamphier open up his land to monitoring of wastes. He points out the hornbook rule that to obtain injunctive relief, a plaintiff must prove that legal remedies are inadequate, that risk of an irreparable injury exists, and that the balance of equities justifies an injunction. Since the plaintiffs here did not attempt to prove irreparable injury, Lamphier argues that the grant of injunctive relief was improper.

This argument fails on at least two counts. First, the law of injunctions differs with respect to governmental plaintiffs (or private attorneys general) as opposed to private individuals. Where the plaintiff is a sovereign and where the activity may endanger the public health, "in-

---

4. From this analysis it follows that the citizen plaintiffs here are not specially entitled to the benefits of substantive relief. We discern a minor trespass on this proposition in the district court's final order, in which Lamphier is directed to provide ongoing access to his property both to the Commonwealth and to the private plaintiffs for the purpose of monitoring wastes. At oral argument, the EDF and CBF conceded that they are not entitled to personal access to Lamphier's property, and we so construe the district court's order. Access is to be granted to the Commonwealth only.

junctive relief is proper, without resort to balancing." *Illinois v. Milwaukee,* 599 F.2d 151, 166 (7th Cir.1979), *rev'd on other grounds,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). Second, in cases of public health legislation, the emphasis shifts from irreparable injury to concern for the general public interest:

> It is contended that the government has not shown irreparable injury and that it has an adequate remedy at law ... The United States, however, is not bound to conform with the requirements of private litigation when it seeks the aid of the courts to give effect to the policy of Congress as manifested in a statute. It is a familiar doctrine that an injunction is an appropriate means for the enforcement of an Act of Congress when it is in the public interest.

*Shafer v. United States,* 229 F.2d 124, 128 (4th Cir.1956). This rationale applies equally to state enforcement of federal and state health laws.

Furthermore, 42 U.S.C. § 6928, the enforcement provision of RCRA, explicitly calls for the judicial issuance of injunctions to coerce compliance with the Act's requirements. Where a statute authorizes injunctive relief for its enforcement, plaintiffs need not plead and prove irreparable injury. *WTAR Radio-TV Corp. v. City Council of the City of Virginia Beach,* 216 Va. 892, 223 S.E.2d 895, 897 (1976). *See also Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189, 197 (4th Cir. 1977); *West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232, 236 (4th Cir.1971). The injunctive relief impliedly authorized under 42 U.S.C. § 6972(a) was amply warranted in this case.[5]

Lamphier further urges that the injunction issued by the district court was not sufficiently specific to pass legal muster.

Rule 65(d) of the Federal Rules of Civil Procedure states:

> Every order granting an injunction and every restraining order shall set forth the reason for its issuance; *shall be specific in terms;* shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained .... (emphasis supplied).

In its Memorandum Opinion and Order filed May 14, 1982, the district court ordered that:

> Plaintiffs[6] and Plaintiff-Intervenor and their agents are granted an injunction and they are expressly authorized to enter onto Defendant's property at reasonable times in order to take such samples and make such tests as the Commonwealth deems appropriate. No bond shall be required.

We find no fatal flaw in the terms of this injunction, which merely requires Lamphier to open up his property to state inspection at reasonable times. By the language of the order, Lamphier is fully apprised of what he must do in order to avoid contempt proceedings. *See International Longshoremen's Assn. v. Philadelphia Marine Trade Assn.,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *United States v. McAndrew,* 480 F.Supp. 1189, 1193 (E.D.Va.1979). The open-ended duration of the injunction is justified by Lamphier's prior lack of cooperation with authorities. Until such time as Lamphier demonstrates abiding compliance with hazardous waste laws, his farm should remain subject to monitoring by health officials.

### V.

Over the objections of counsel, the trial judge ordered Lamphier to testify regarding the contents of two letters written by

---

**5.** Despite Lamphier's assertion that he has terminated his waste disposal enterprise and therefore should not be required to comply with 42 U.S.C. §§ 6925 and 6930, we believe the evidence amply demonstrates the continued risk of environmental contamination either from undisclosed barrels still buried on the farm or from the residue of wastes formerly present. More proof is required to convince us that Lamphier has indeed left the waste disposal business.

**6.** *See* n. 4 *supra.*

Lamphier's lawyer, Nageotte, to Gilley, on February 27, 1981, and July 24, 1981, regarding Lamphier's waste storage activities. On the stand, Lamphier was asked to provide the details behind the facts disclosed in Nageotte's letters. Lamphier had previously introduced the letters into evidence, and the court ruled this constituted a limited waiver of Lamphier's right against self-incrimination. Lamphier does not contend that he was forced to testify beyond the scope of the two letters.

 Where incriminating facts have been voluntarily revealed, the fifth amendment privilege may not then be invoked to avoid disclosure of the details. *Rogers v. United States,* 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951); *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 873 (7th Cir.1979). We would be more concerned about the revelations elicited from Lamphier on the witness stand if we felt those comments posed a real and substantial danger of further incrimination beyond the contents of the letter. *See Ellis v. United States,* 416 F.2d 791, 802 (D.C.Cir. 1969). Here, however, the gist of Lamphier's possible criminal conduct was fully recounted in the two letters, and we discern no additional danger to Lamphier in the disclosure at trial of explanatory details.

## VI.

Lamphier maintains that the district court's order requiring him to comply with RCRA (specifically, to notify EPA of hazardous waste activities after August 19, 1980, to apply for a permit for such activities, and to comply with the requirements for a hazardous waste facility operating in interim status) forces him to make incriminating disclosures. In support Lamphier cites *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), in which the Court invalidated the filing requirements of gambling tax statutes pointedly intended to ensnare individuals engaged in criminal activity.

 This case is not governed by *Marchetti* and *Grosso,* but rather by *Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). Under the *Shapiro* doctrine, records required as part of a valid regulatory scheme (as opposed to a ploy to entrap gamblers, drug dealers, etc.) are not barred on fifth amendment grounds even though they may contain incriminating information. The *Marchetti* Court distinguished and affirmed the *Shapiro* doctrine at the same time it invalidated the gambling tax statute, stating that while reporting requirements in "an essentially non-criminal and regulatory area of inquiry" are permissible despite the possibility of incidental self-incrimination, an inquiry directed to a "selective group inherently suspect of criminal activities" is not. 390 U.S. at 57, 88 S.Ct. at 707.

In Lamphier's case, compliance with the district court's order would not eventuate in criminal prosecution, but would rather simply bring Jim's Liquid Waste into compliance with the regulatory scheme set out in 42 U.S.C. §§ 6925 and 6930. In passing RCRA, Congress did not outlaw the hazardous waste business; it merely set up a regulatory program for monitoring those activities.

Hence, Lamphier's argument is meritless.

## VII.

 Lamphier quarrels with the trial court's admission of evidence that wastes were hauled onto the farm several months before the effective date of RCRA notification. This evidence, according to Lamphier, constituted hearsay and was irrelevant and prejudicial under Fed.R.Evid. 401, 403, and 802.

The evidence was properly admitted. There was no hearsay component to the testimony by Lamphier's employees that they brought wastes to the farm up until March, 1980. The testimony was relevant to the issue of whether Lamphier operated a hazardous treatment, storage or disposal facility in violation of RCRA and state law. The court did not shift the burden to Lamphier of proving nonpresence of hazardous

materials as of the statutory deadline; ample evidence presented by the plaintiffs—evidence including Lamphier's own admissions—proves that the wastes brought in before March, 1980 never left the property (that is, until they were incinerated).

Furthermore, the evidence was not unduly prejudicial. It simply informed the trial court that Lamphier was in the business of storing wastes.

## VIII.

■ Lamphier challenges Gilley's competence as an expert witness on the application and interpretation of statutes and regulations in Virginia that govern solid waste disposal activities.

The trial judge has broad discretion to certify experts. Fed.R.Evid. 702. As director of the Virginia Health Department's Division of Solid and Hazardous Waste, Gilley could be expected to have a familiarity with hazardous waste legislation. There was no abuse of discretion by the trial judge in admitting Gilley's expert testimony. *See Fernandez v. Chios Shipping Co., Ltd.,* 542 F.2d 145, 153 (2d Cir.1976).

## IX.

■ Finally, Lamphier complains that because the trial court failed to hold a formal hearing on the issue of duplication of attorney effort, he was denied due process in the court's award of counsel fees.

It is apparent that the trial judge gave careful consideration to the submission of fees by counsel for the EDF and CBF, for he held that an appropriate award should be five percent less than counsel's submissions, due to duplication of efforts. He denied Lamphier's request for a formal hearing, saying that nothing would be gained from such a procedure.

The district court did not act arbitrarily in assessing fees, nor did it err in denying Lamphier's motion for a hearing. Just as we recently held in *Thomason v. Schweiker,* 692 F.2d 333, 336 (4th Cir.1982), we believe here that "the [judge] who heard the case is in a superior position to decide [the issue of appropriateness of attorneys fees], and a further evidentiary hearing would serve no useful purpose."

## X.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.