## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Plaintiff–Appellee,

and

Supporters To Oppose Pollution, Incorporated, Intervenor/Plaintiff–Appellee,

v.

ENVIRONMENTAL WASTE CONTROL, INCORPORATED, doing business as Four County Landfill, Steven W. Shambaugh, James A. Wilkins, West Holding Company, Incorporated, Defendants–Appellants.

Nos. 89–1865, 89–2197.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 25, 1990.

Decided Oct. 31, 1990.

Andrew B. Baker, Jr., Asst. U.S. Atty., Hammond, Ind., Clifford D. Johnson, Asst. U.S. Atty., South Bend, Ind., Anna Thode, E.P.A., Washington, D.C., Victor A. Franklin, E.P.A., Chicago, Ill., Robert Oakley, F. Henry Habicht, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for E.P.A.

John C. Hamilton, Doran, Blackmond, Ready, Hamilton & Williams, South Bend, Ind., Charles M. Tebbutt, Syracuse, N.Y., for Supporters To Oppose Pollution, Inc.

James H. Pankow, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, Ind., George W. Pendygraft, George Plews, Carolyn A. Kaye, Pendygraft & Plews, Indianapolis, Ind., for Environmental Waste Control, Inc., and Steven W. Shambaugh, and West Holding Co., Inc.

James H. Pankow, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, Ind., John T. Stahr, John A. Bryson, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Charles M. Tebbutt, Syracuse, N.Y., for James A. Wilkins.

Daniel B. Dovenbarger, Rubin & Levin, Indianapolis, Ind., for amicus curiae Sierra Club.

Before WOOD, Jr., CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

The Environmental Protection Agency, together with an environmental intervenor,

Supporters to Oppose Pollution, Inc., brought suit against Environmental Waste Control (and its owners and operators) in connection with a hazardous waste landfill operated by Environmental Waste Control in Indiana. The district court found against Environmental Waste Control, ordered the offending landfill permanently closed (along with certain other corrective measures) and assessed civil fines amounting to almost $3,000,000. Environmental Waste Control appeals. We affirm.

## I. FACTUAL BACKGROUND

This appeal arises from an enforcement action brought by the United States, on behalf of the Environmental Protection Agency (the "EPA"), to enforce hazardous waste requirements under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–87, at Environmental Waste Control's Four County Landfill (the "Landfill") in Fulton County, Indiana. The United States brought this action against Environmental Waste Control, James Wilkins, and the West Holding Company as the Landfill's owners, and against Environmental Waste Control and Steven Shambaugh as the Landfill's operators. (All are referred to collectively as "EWC.")

RCRA establishes a comprehensive federal program governing the generation, transportation, storage and treatment of hazardous wastes "to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). 42 U.S.C. § 6925(a) requires that a hazardous waste facility be operated only in accordance with a permit. Recognizing that the EPA could not issue permits to all applicants before RCRA's effective date, Congress provided that a facility in existence as of November 19, 1980, could obtain "interim status," allowing it to continue operating until final action on its permit application. 42 U.S.C. § 6925(e); *see also Northside Sanitary Landfill, Inc. v. Thomas,* 804 F.2d 371, 373–74 (7th Cir. 1986). To obtain interim status, a facility is required to file a limited "Part A application," and is then "treated as having been issued a permit." 42 U.S.C. § 6925(e);

*Northside Sanitary Landfill,* 804 F.2d at 374. An interim status facility must comply with the standards set forth in 40 C.F.R. pt. 265, which, among other things, mandates that such a facility have a "ground-water monitoring program capable of determining the facility's impact on the quality of ground water in the uppermost aquifer underlying the facility" and also requires that an interim status facility meet certain financial responsibility requirements.

Following the submission of the "Part A application," a facility must file a "Part B application" to obtain a permit. *Northside Sanitary Landfill,* 804 F.2d at 374. Upon successful completion of the Part B process, a hazardous waste permit is issued, and the facility must comply with this permit and the regulatory standards set forth in 40 C.F.R. pt. 264.

In 1984, Congress passed the Hazardous and Solid Waste Amendments (the "HSWA") to RCRA. The HSWA were adopted in response to concerns about widespread groundwater contamination from interim status facilities. The HSWA provide, in part, that all land disposal facilities granted interim status before November 8, 1984, would automatically lose that status on November 8, 1985, unless the facility: (A) applied for a final Part B permit determination before November 8, 1985; and (B) certified that it was "in compliance with applicable groundwater monitoring and financial responsibility requirements." 42 U.S.C. § 6925(e)(2). RCRA also requires the owners and operators of hazardous waste landfills to comply with minimum technology requirements which mandate the installation of two or more liners and a leachate collection system for the lateral expansion of interim status landfills with respect to waste received after May 8, 1985. 42 U.S.C. §§ 6924(*o*)(1)(A) and 6936(b). When the EPA determines that there has been a release of hazardous waste from an interim status facility, the EPA may seek corrective action. 42 U.S.C. § 6928(h)(1). Accordingly, the EPA filed suit against EWC in federal court, alleging basically: (1) that the Landfill had lost its interim status by failing to comply with the

applicable financial responsibility and groundwater monitoring requirements; (2) that EWC had violated RCRA's minimum technology requirements between May 8, 1985 and August 16, 1986; (3) that the Landfill's groundwater monitoring system did not comply with the applicable regulations; and (4) that hazardous waste or hazardous waste constituents had been released at the Landfill, thereby permitting the court to order a corrective measure study. The EPA sought civil penalties and an order closing the Landfill, at least temporarily. The Supporters to Oppose Pollution ("STOP"), the environmental intervenor, joined the EPA's claims, but asked for a permanent, instead of temporary, closing of the Landfill. STOP also brought additional claims relating to the Landfill's alleged release of hazardous waste into the environment.

A month-long trial was held. In its Memorandum Opinion and Order, the district court noted its shock and dismay at EWC's conduct, explaining that EWC, while "afforded repeated opportunities to comply with RCRA requirements ... has responded by developing a dismal history of delay, mis-performance, and noncompliance." *U.S. EPA v. Environmental Waste Control, Inc.,* 710 F.Supp. 1172, 1247 (N.D.Ind.1989). The district court essentially found: that the Landfill had lost its interim status as of November 8, 1985 because, as of that date, it had not fully complied with the required financial assurance and groundwater monitoring standards (*id.* at 1178, 1240); that EWC had failed to maintain an adequate monitoring system and had illegally disposed of hazardous wastes in cells lacking liners (*id.* at 1220–25); and that, as a result of EWC's violations, there was a release of hazardous wastes which contaminated groundwater underlying the Landfill and which had the potential for contaminating nearby private drinking wells (*id.* at 1227–28). The district court assessed civil penalties of nearly

$3,000,000 against EWC. The district court also ordered EWC to undertake certain corrective measures and, most importantly, permanently enjoined the operation of the Landfill.

EWC appeals on the grounds that: (1) a permanent injunction was improper; (2) the Four County Landfill should not have lost its interim status; (3) its current groundwater monitoring system is fully adequate, and (4) the corrective action plan mandated by the district court was inappropriate for the conditions existing at the Four County Landfill.[1] We affirm the judgment of the district court in all respects.

## II. Legal Analysis

### A. The Propriety of the Permanent Injunction

EWC claims that the enforcement of a permanent injunction against its landfill is improper because: (1) RCRA does not authorize permanent closure in interim enforcement cases; (2) the district court did not adequately consider, or properly weigh, the competing equities; and (3) the evidence adduced at trial showed that there had been no substantial harmful effects on the environment. None of EWC's claims has merit.

EWC first contends that RCRA does not authorize permanent closure in *interim status* cases. We are puzzled how EWC can seriously advance this argument. First, it should be noted that the district court held that EWC "has not argued that permanent closure is not an available remedy." *Environmental Waste Control,* 710 F.Supp. at 1245. Hence, in all likelihood, EWC has waived this argument. Regardless, the text of the relevant statute plainly allows for a permanent injunction in interim status cases such as this one.

42 U.S.C. section 6928(h)(1) is entitled "Interim status corrective action" and provides:

1. In addition, EWC alleges several jurisdictional and other related errors. The district court, in its well-reasoned Memorandum Opinion and Order of March 29, 1989, rejected EWC's jurisdictional claims. *Environmental Waste Control,*

710 F.Supp. at 1184–1201. Because the district court's order adequately addresses and properly disposes of all the jurisdictional and other related arguments EWC raises on appeal, we adopt its reasoning and conclusions.

Whenever on the basis of any information the Administrator [of the EPA] determines that there is or has been a release of hazardous waste into the environment from a facility authorized to operate under section 6925(e) of this title, the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment or the Administrator may commence a civil action in the United States district court in the district in which the facility is located for appropriate relief, *including a temporary or permanent injunction.* (emphasis supplied).

Hence, it is clear from the language of this section that a permanent injunction is an available remedy in interim status cases. When the text and meaning of a statute are clear, we will not look to legislative history. *United States v. Sager,* 881 F.2d 364, 365–66 (7th Cir.1989).

■ EWC's next contention, that the district court did not properly balance the competing equities, is simply incorrect. The record shows that the district court, in fact, went to great pains to outline the reasons (which included threats to the environment) for its decision to permanently enjoin the operation of EWC's landfill. *Environmental Waste Control,* 710 F.Supp. at 1245–47. Moreover, it is clear that the district court specifically undertook to balance the benefit to the public against the harm to the public in this case. *Id.* at 1247 ("The risk to the public of any continued operation of the Four County Landfill by EWC greatly outweighs any harm from permanent closure."). In addition, we think it beyond question, given the district court's findings, that a remedy at law would have been inadequate in this case. As the Supreme Court noted in *Amoco Production Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987):

Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

■ Hence, the record shows that the district court did balance the competing equities both thoroughly and correctly in this case—notwithstanding that it may not have even been required to undertake such a balance. It is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful. *See Guam Scottish Rite Bodies v. Flores,* 486 F.2d 748, 749 (9th Cir.1973). As noted earlier, the district court essentially found that EWC's conduct had been willful. Moreover, as the Fourth Circuit noted, relying on an opinion of ours:

the law of injunctions differs with respect to governmental plaintiffs (or private attorneys general) as opposed to private individuals. Where the plaintiff is a sovereign and where the activity may endanger the public health, "injunctive relief is proper, without resort to balancing." *Illinois v. Milwaukee,* 599 F.2d 151, 166 (7th Cir.1979), *rev'd on other grounds,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). Second, in cases of public health legislation, the emphasis shifts from irreparable injury to concern for the general public interest. . . .

*Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 337–38 (4th Cir. 1983).

■ For all the foregoing reasons, we find that the district court's decision to issue a permanent injunction against EWC was correct and was supported by the potential danger to the environment and to public health.[2]

2. Our conclusion is in no way changed by the fact that it was STOP, and not the EPA, that asked for permanent closure of the Landfill. The right to intervene, codified at 42 U.S.C. § 9613(i) (1987 Supp.), permits citizens to press the same procedural and substantive claims that the United States may pursue. *See also Environmental Waste Control,* 710 F.Supp. at 1245 n. 73.

## B. The Loss of Environmental Waste Control's "Interim Status"

EWC contends that the Four County Landfill never lost its interim status, despite the contrary finding of the district court, because (1) EWC's insurance complied with all applicable regulations as of November 8, 1985, or, in the alternative, because the district court should have considered good faith a defense to the failure to carry the required amount of insurance; and (2) because EWC was actually in compliance with the applicable hazardous waste groundwater monitoring requirements as of November 8, 1985.

■ Under RCRA's interim status provision, 42 U.S.C. § 6925(e)(2), the failure of a landfill to meet either the applicable financial responsibility or groundwater monitoring requirements, as of November 5, 1985, automatically results in the loss of interim status. Because we find that EWC failed to carry the required amount of insurance and because good faith is not an adequate defense to compliance with these financial regulations, EWC lost its interim status as of November 8, 1985. We therefore need not address EWC's allegations concerning whether the Landfill met the groundwater monitoring standards required of interim status facilities as of November 8, 1985.

■ With respect to RCRA's financial responsibility requirements for interim status facilities, EWC makes five arguments (all of which were rejected by the district court): (1) that the applicable insurance regulations did not expressly require that the prescribed amounts of required coverage be aggregated (and EWC, which had not aggregated, therefore had enough); (2) that EWC's coverage was adequate because it was approved by the Indiana Department of Environmental Management;[3] (3) that the EPA was estopped from asserting that a higher amount of insurance was necessary because an operator of the EPA's "hot line" assured EWC's insurance broker that $3,000,000/$6,000,000 was ade-

quate; (4) that an endorsement on EWC's primary policy was in force which provided an assurance that EWC's policy complied with RCRA's requirements; and (5) that another policy was in force which, coupled with EWC's primary policy, met the statutory requirements.

■ EWC initially challenges the district court's ruling that the EPA's interim status regulations required total coverage for sudden and nonsudden occurrences of $4,000,000 per occurrence and $8,000,000 in the aggregate. The relevant financial responsibility regulations are set forth in 40 C.F.R. § 265.147. Subpart (a) requires, with respect to hazardous waste treatment, storage or disposal facilities, that:

> [t]he owner or operator must have and maintain liability coverage for sudden accidental occurrences in the amount of at least $1 million per occurrence with an annual aggregate of at least $2 million, exclusive of legal defense costs.

Subpart (b) applies to surface impoundments, landfills or land treatment facilities and requires that:

> [t]he owner or operator must have and maintain liability coverage for nonsudden accidental occurrences in the amount of at least $3 million per occurrence with an annual aggregate of at least $6 million, exclusive of legal defense costs.

The district court held that because both subparts applied to the operations of EWC, EWC was required to comply with the financial strictures of both, totaling $4,000,000 per occurrence with an annual aggregate of $8,000,000. *Environmental Waste Control*, 710 F.Supp. at 1209–10.

EWC contends that the requirements "nowhere expressly stated that a total of $4 million per occurrence and $8 million annual aggregate was required for a combined limits policy." Appellants' Brief at 33. (EWC carried an insurance policy which covered only $3,000,000 per occurrence and had an annual aggregate of $6,000,000.) But we think that the require-

---

**3.** Given that the federal government has not delegated enforcement of the strictures of the HSWA to the states, EWC cannot rely on Indiana's approval of its insurance policy as proof that it complied with federal law. *See Environmental Waste Control*, 710 F.Supp. at 1183.

ments were clear. The separate subparts applied to different types of occurrences. Each subpart had to be satisfied. Aggregation was therefore required. As noted previously, we will not look past statutory or regulatory language when the text is clear. *See United States v. Sager*, 881 F.2d at 365–66.

EWC argues, however, that the 1988 amendment to these regulations, which explicitly calls for aggregation of the interim status insurance requirements, and the 1981 draft of the regulations (which also contained an aggregation provision that was later deleted) support its theory that aggregation was not required *until* the 1988 amendment. Appellants' Brief at 33–36. We do not agree. Perhaps Congress, or the EPA, thought that the regulation was clear without a specific aggregation provision—clear, that is, until interim status facilities' operators tried to avoid the requirement by arguing that aggregation was not required. In sum, we think that the language of this regulation was sufficiently clear to preclude a presumption that the 1988 amendments were meant to change, rather than clarify, existing law. Indeed, the 1988 rule states that it is merely "specifying more clearly" the aggregate coverage mechanisms required by combined coverage mechanisms (53 Fed.Reg. at 33,939); that the EPA decided "to maintain the present scope of coverage" (*id.* at 33,946); and that the modification "does not add any compliance requirements" (*id.* at 33,949).

■■■■■ EWC's other arguments pertaining to the insurance requirements applicable to interim status facilities can be similarly rejected. Information provided

by a government hot line cannot be enough to estop the government from enforcing violations of federal law. *See Crown v. United States R.R. Retirement Bd.*, 811 F.2d 1017, 1021 (7th Cir.1987). Moreover, we hold that reliance on such a hot line here was not reasonable, given the clarity of the regulations. With respect to EWC's claims regarding the endorsement and the additional insurance policy, we find that the district court was correct in rejecting these arguments. The endorsement, for example, clearly states that it does not modify the policy, the terms of which were only $3,000,000 per occurrence and $6,000,000 in the aggregate. And, the district court expressly excluded evidence regarding EWC's second insurance policy, a policy which had probably expired and which was never identified to the EPA (or to the district court until 169 weeks into the instant lawsuit) as a source of coverage. Given the facts, this exclusion was clearly appropriate. We therefore reject EWC's claims that it complied with the applicable financial responsibility regulations. Accordingly, the Four County Landfill lost its interim status as of November 8, 1985.[4]

### C. The Adequacy of EWC's Groundwater Monitoring System

The district court held that the groundwater monitoring system at the Landfill did not meet the required standards as of November 8, 1985, and also held that, even at the start of trial, the Landfill did not have a compliant groundwater monitoring system. In this regard, the district court noted that

[t]he purpose of a hazardous waste landfill's groundwater monitoring system is to detect immediately the migration of

---

**4.** EWC asserts that its good faith should be a defense to noncompliance with the groundwater monitoring and financial responsibility requirements imposed upon interim status facilities. The district court rejected this argument on the grounds that EWC's "good faith"—while relevant to the scope of relief and penalties—was not relevant to whether EWC actually complied with the federal requirements. *Environmental Waste Control,* 710 F.Supp. at 1212–13. We agree. The fact that EWC attempted to comply with the insurance regulations and that no harm resulted from EWC's under-insurance is

simply irrelevant. The fact still remains that EWC failed to meet federal standards, a failure which deprived EWC of its interim status. Given the environmental problems facing the world today and the federal laws in question, we think that it would be counterproductive to read a "good faith" defense where none exists. We will not excuse EWC from failing to satisfy the requirements of our environmental laws. Hence, we think that the district court's decision not to recognize a "good faith" defense here was eminently sound.

hazardous waste or hazardous waste constituents from the waste management area into the environment so that any necessary corrective or remedial action can be taken. Among the major threats a hazardous waste landfill may pose to public health and the environment is the potential that hazardous constituents may escape and contaminate the groundwater beneath the facility.

\* \* \* \* \* \*

The design, construction, and depth of [the Landfill's] groundwater monitoring wells have prevented EWC and its consultants from learning the extent and permeability of the uppermost aquifer, which precludes confident assessment of the groundwater flow's horizontal and vertical direction and velocity. One cannot design a meaningful groundwater monitoring system without knowing the location of the uppermost aquifer and direction of the groundwater flow. EWC has not acquired that knowledge.

*Environmental Waste Control,* 710 F.Supp. at 1222. Hence, the district court found that EWC was in continuing violation of 40 C.F.R. section 265.90(a), which requires that an interim status facility have a groundwater monitoring program that is "capable of determining the facility's impact on the quality of ground water in the uppermost aquifer." [5] *Id.* at 1225.

■■■ The thrust of EWC's complaint on appeal seems to be that the district court erred in not admitting newly obtained data into evidence or, in the alternative, that the district court erred in finding EWC's groundwater monitoring system to be inadequate. Whether EWC's groundwater monitoring system complied with federal law is a question of fact which will not be disturbed unless clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1984).

Our review of the record leads us to the conclusion that there was no clear error here. The new data proffered by EWC came too late for its probative value to outweigh its prejudice. Appellee's Brief at 37 (citing Tr. 3582–83, 3591–92). Moreover, the evidence in the record was sufficient to sustain the court's extensive findings. We therefore affirm the district court's decision as to the inadequacy of EWC's groundwater monitoring system.

### D. The District Court's Corrective Action Plan

■■■ Finally, EWC contends that the corrective action plan imposed by the district court was inappropriate for the conditions existing at the Landfill. Again, we disagree. The assessment of penalties is committed to the informed discretion of the trial court, and will be reversed only upon a showing that the district court abused its discretion. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 229 n. 6, 95 S.Ct. 926, 930 n. 6, 43 L.Ed.2d 148 (1975). EWC has offered us no sound reason which would justify a finding that the district court abused its discretion in deciding on the corrective action plan and other remedies, remedies which were clearly imposed only after thoughtful examination and assessment of the evidence and applicable law. *See Environmental Waste Control,* 710 F.Supp. 1241–49.

As to other matters raised by EWC, they have been considered and have been found to be without merit.

---

5. The district court explained that
[a]n aquifer is a geologic formation, group of formations, or part of a formation capable of yielding a significant amount of groundwater to wells or springs. The uppermost aquifer is that nearest the natural ground surface and

includes the lower aquifers that are hydraulically interconnected to that aquifer within the facility's property boundary.
*Environmental Waste Control,* 710 F.Supp. at 1213 n. 33.