804 F.2d 371
 25 ERC 1065, 17 Envtl. L. Rep. 20,215
 NORTHSIDE SANITARY LANDFILL, INC., Petitioner,
v.
Lee M. THOMAS, as the Administrator of the United States
Environmental Protection Agency, and the United
States Environmental Protection Agency,
Respondents.
 No. 85-2119.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 4, 1986.
Decided Oct. 23, 1986.
As Amended Nov. 17, 1986.
Rehearing Denied Dec. 29, 1986.
 
 Warren D. Krebs, Parr, Richey, Obremskey & Morton, Indianapolis, Ind., for petitioner.
 Michael A. McCord, Dept. of Justice, Washington, D.C., for respondents.
 Before WOOD, COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge.
 
 
 1
 The primary question that we will consider in addressing this petition for review of an order of the Administrator of the Environmental Protection Agency ("Administrator") denying the petitioner's hazardous waste management permit application, is whether the petitioner has standing to challenge remarks concerning the scope of closure of the petitioner's facility that were made by the Administrator during the permit denial proceedings. For the reasons stated below, we will dismiss the petition for review.
 
 
 2
 * A. Statutory and Regulatory Provisions
 
 
 3
 The Resource Conservation and Recovery Act of 1976 ("Act"), codified as amended at 42 U.S.C. Secs. 6901-6991, governs the disposal of solid waste in the United States. In particular, Secs. 3001 through 3013 of the Act, codified as amended at 42 U.S.C. Secs. 6921-6934, regulate hazardous waste management and disposal. Section 3005(a) of the Act, codified as amended at 42 U.S.C. Sec. 6925(a), provides that "the Administrator shall promulgate regulations requiring each person owning or operating an existing [hazardous waste disposal] facility ... to have a permit issued pursuant to this section." Section 3004 of the Act, codified as amended at 42 U.S.C. Sec. 6924(a), requires that the Administrator "promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous wastes ..., as may be necessary to protect human health and the environment."
 
 
 4
 Recognizing that the Environmental Protection Agency ("EPA") could not issue permits to all hazardous waste applicants before the effective date of the Act, Congress provided that, under Sec. 3005(e) of the Act, the Administrator promulgate regulations that allowed the owner or operator of a hazardous waste management facility that was in existence on November 19, 1980, to file a "Part A application," and to continue hazardous waste disposal pending the final administrative action on the facility's application. The Part A application calls for minimal information concerning the nature of the applicant's business, a description of the hazardous waste management processes it employs, a specification of the types of hazardous wastes processed, stored, or disposed of at the facility, as well as maps, drawings and photographs of the facility's past, present, and future waste processing areas. Id. Sec. 270.13. If the Administrator finds no reason to believe that the Part A application does not meet the disclosure requirements of id. Sec. 270.13, once it has filed a Part A application and given proper notice of hazardous waste activities, an existing facility "shall have interim status and shall be treated as having been issued a permit." 42 U.S.C. Sec. 6925(e); 40 C.F.R. Sec. 270.70. The operation of a facility that has been granted interim status is limited to the types of wastes, as well as the processing, storage, and disposal procedures specified in the Part A application. Under 40 C.F.R. Sec. 270.71, the facility must comply with the operating standards set forth at 40 C.F.R. Part 265. A facility's interim status terminates either upon final administrative disposition of a permit application, 40 C.F.R. Sec. 270.73(a), or upon failure of the operator to furnish the full information required by the Part B application, as described below.[1]
 
 
 5
 Following the approval of a facility's Part A application and the grant of interim status, the facility must file a "Part B application" with the EPA. The Part B application calls for detailed information, including chemical and physical analyses of the hazardous waste treated at the facility, a description of procedures for preventing contamination of water supplies, a determination of the applicable seismic standard for the facility, a determination whether the facility is located within a flood plain, and data relating to groundwater monitoring. Id. Sec. 270.14. The applicant must also furnish information concerning its use of hazardous waste containers, storage or disposal tanks, surface impoundments, waste piles, incinerators, land treatment facilities, and landfills. Id. Secs. 270.15-270.21. Upon successful completion of both the Part A and Part B application, an operator is issued a hazardous waste permit, and is required to comply with the standards set forth in id. Secs. 264.1-264.351 ("Part 264").
 
 
 6
 A facility that has been approved for interim status operation must prepare a written closure plan, a copy of which must be kept at the facility. Id. Sec. 265.112. The purpose of the closure plan is to "protect human health and the environment, [to prevent] post-closure escape of hazardous waste, hazardous waste constituents, leachate, contaminated rainfall, to [protect against the escape] of waste decomposition products to the ground or surface waters or to the atmosphere." Id. Sec. 265.111(b). Once closure has been ordered, the owner or operator of the facility must terminate operations in a manner that minimizes the need for further maintenance of the facility. Id. Sec. 265.111(a).
 
 
 7
 A closure plan must "identify the steps necessary to completely or partially close the facility at any point during its intended operating life and to completely close the facility at the end of its intended operating life." Id. Sec. 265.112(a). In addition, the closure plan must provide for post-closure care for a period of thirty years after the facility is closed. Id. Sec. 265.117(a). Post-closure measures include ground-water monitoring, maintenance of other monitoring and waste containment systems, and periodic reporting. Id. Sec. 265.117. The plan may be amended as changes in the operation of the facility so dictate. Id. Sec. 112(4)(b).
 
 
 8
 The owner or operator of a hazardous waste management facility must submit a closure plan to the appropriate EPA regional administrator at least 180 days before the date the facility is expected to begin closure. Id. Sec. 112(4)(c). However, if the EPA has terminated the facility's interim status and has not issued a hazardous waste permit for the facility, the closure plan must be submitted to the EPA no later than fifteen days after interim status is terminated. Id. Sec. 112(4)(c)(1). The public is provided an opportunity to comment on the submitted plan. Id. Sec. 112(4)(d). The regional administrator must approve, modify, or disapprove the closure plan within ninety days of its receipt. The owner or operator of the facility is given sixty additional days to modify or prepare a new plan should the Regional Administrator have modified or rejected the original plan. Id. Whatever modification or revision the Regional Administrator then makes of the operator's revised plan shall become the approved closure plan. Id.
 
 
 9
 Section 3005(c) of the Act, codified as amended at 42 U.S.C. Sec. 6925(c), provides that a state environmental agency, as authorized by the Administrator pursuant to 42 U.S.C. Sec. 6947(a), is responsible for the issuance of hazardous waste management permits. Section 3006 of the Act, codified as amended at 42 U.S.C. Sec. 6926, provides that a state may apply to the Administrator for authority to develop and enforce a hazardous waste program "in lieu of" a federal program and federal enforcement. 40 C.F.R. Secs. 271.1-271.137 ("Part 271") sets forth the requirements for authorizing state programs. Under these regulations, a state may obtain "interim authorization" in two "phases." Phase I tracks the regulations of 40 C.F.R. Secs. 265.1-265.430 ("Part 265"), and authorizes the state agency to, among other things, conduct closure proceedings for interim status facilities. See id. Sec. 271.28. Once a state obtains Phase I authorization, its regulations and procedures displace the federal interim status regulations. Phase II authorization allows the state to issue permits under standards corresponding to those found in Part 270, and to enforce standards corresponding to those found at Part 264.
 
 
 10
 Section 7006(b) of the Act, codified as amended at 42 U.S.C. Sec. 6976(b), provides that "[r]eview of the Administrator's action ... in issuing, denying, modifying, or revoking any permit ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person.... Such review shall be in accordance with sections 701 through 706 of Title 5." If a party has been aggrieved by the action of an authorized state agency, review of the agency's decision shall be had in accordance with the applicable state regulations.
 
 B. Facts
 
 11
 The petitioner, Northside Sanitary Landfill, Inc., ("Northside"), operates a landfill near Zionsville, Indiana, and provides sanitary and hazardous waste disposal services for Indianapolis and Boone County, Indiana. Northside was in existence for many years prior to the passage of the Act. On November 18, 1980, Northside submitted a Part A application to the Administrator for a hazardous waste treatment and disposal permit. As part of its application materials, Northside included a hand-drawn scale map of its facility. The map delineated five areas within Northside's property boundary.
 
 
 12
 The first, the "Old Farm" area (also called the "Past Treatment and Disposal Area" or the "West Farm"), consisted of forty acres. Northside claims that it had not used the Old Farm for the disposal of hazardous wastes after the statutory cut-off date of November 19, 1980. The Administrator disputes this claim. The second, the "East Farm Area" (also called the "Current Treatment and Disposal Area"), consisted of approximately thirty acres. Northside and the Administrator agree that hazardous wastes were disposed of in the East Farm area after November 19, 1980. The third area, composed of two tracts and designated the "Proposed Future Treatment and Disposal Area" (also called the "North Farm Area"), consisted of sixty-four acres. In its brief before this court, the Administrator acknowledged that "it appears from the record that no wastes of any kind have been disposed of in this area." The fourth area was labelled the "Storage and Treatment Tank Area." The fifth and final tract (unnamed in the application) had upon it a storage barn, repair shop, and Northside's office.
 
 
 13
 In its Part A application, Northside requested approval of a "303 acre-feet" disposal capacity. Northside maintains that the disposal capacity proposed was solely for the thirty acre East Farm area. On June 9, 1982, the Region V Administrator acknowledged that Northside's application qualified it for interim status, and noted that a 303 acre-feet process design capacity has been approved for Northside's facility. On January 26, 1983, the Region V Administrator requested that Northside submit a Part B application by July 29, 1983. According to the Administrator, that application was received on August 8, 1983.
 
 
 14
 After the submission of Northside's Part B application, the Region V Administrator sent Northside three notices that the information contained in the application was deficient and, hence, the application did not comply with the applicable regulations. Northside failed by the required dates to correct the deficiencies. On April 30, 1984, Northside informed the Region V Administrator by letter that it was "official[ly]" withdrawing its Part B application. On July 25, 1984, the Region V Administrator, however, pursuant to 40 C.F.R. Sec. 124.10, issued a notice of his tentative decision to deny Northside's permit application on the grounds that the application was deficient, did not adequately provide for the protection of groundwater, and that other "continuing environmental violations" had occurred. In accordance with 42 U.S.C. Sec. 6974(b) and 40 C.F.R. Secs. 124.11-124.12, a public hearing was held on August 28, 1984, at Zionsville, Indiana.
 
 
 15
 At the public hearing, the EPA stated that Northside's Part B application did not include closure information regarding the areas of its facility for which interim status had been granted. In response, Northside stated that the Region V Administrator had incorrectly considered the Old Farm Area as part of Northside's permit application. Northside maintained that it had sought a permit for a 303 acre-feet disposal capacity, and that this was to be located in the East Farm. Northside added that, of the thirty acres composing this area, only twelve acres had actually been used for the treatment and disposal of hazardous wastes. Northside did not, however, contest the denial of its Part B application.
 
 
 16
 On October 12, 1984, the Region V Administrator denied Northside's Part B application on the ground that Northside had failed to submit the necessary information. Pursuant to 40 C.F.R. Sec. 270.73(a), the Region V Administrator also terminated Northside's interim status on the ground that a final administrative disposition had been made of Northside's permit application. In response to Northside's position at the public hearing, the Region V Administrator stated in his order that hazardous waste had been disposed of after November 19, 1980, in the Old Farm Area as well as the East Farm. The administrator concluded that "[t]he entire hazardous waste landfill area outlined in the November 18, 1980, Part A application must be closed. This includes the 'Old Farm Area.' " The Region V Administrator's order disallowed any further hazardous waste storage, treatment, or disposal of hazardous waste at the Northside facility. Moreover, the order required Northside to commence immediate closure proceedings under the applicable Indiana regulations.
 
 
 17
 On November 8, 1984, pursuant to 40 C.F.R. Sec. 124.19, Northside petitioned the Administrator for review of the Region V order that denied its permit application and ordered closure. Attached to Northside's petition was a copy of its Part A application with a drawing of the facility and a copy of an aerial photograph taken of the facility on September 9, 1980. Northside also included the revised "General Facility Description" from its Part A application, which description indicated that the forty-acre Old Farm Area had not been used for hazardous waste treatment and disposal since November 1980, and that the sixty-four acre North Farm Area had never been used for hazardous waste processing. Northside claimed (both before the Administrator and before this court) that, on January 4, 1985, the Region V Administrator submitted drawings of Northside's facility to the Administrator that inaccurately depicted the areas that Northside requested the EPA consider for a hazardous waste management permit.
 
 
 18
 In its petition for review to the Administrator, Northside twice reiterated its position that it was not challenging the denial of its Part B application. It claimed, however, that the comments made by the Region V Administrator relating to the scope of closure were based upon inaccurate information and were, therefore, clearly erroneous. Although Northside, by implication, maintained that the disputed comments addressed a matter, viz., closure, not appropriately a subject for permit denial proceedings, it argued that, if the Administrator nevertheless considered the comments appropriate in the context, then Northside should have an appeal as of right under 40 C.F.R. Sec. 124.19. Finally, in an effort to challenge the disputed comments, not to challenge the denial of its Part B application per se, Northside stated that, "[i]f necessary for administrative appellate review, the Administrator should consider Northside's submittal an appeal from the permit decision."
 
 
 19
 On April 3, 1985, the Administrator issued an order denying Northside's petition for review of the Region V Administrator's denial of Northside's hazardous waste application. The Administrator did, however, state that the questions Northside raised regarding the areas within the (1) facility that were encompassed by its Part A and Part B permit applications and (2) that could properly be closed addressed two of:
 
 
 20
 the most rudimentary pieces of information that go into a proper permit decision. If the permit decision does not identify where the facility is located, or how big it is, the permit decision cannot be implemented successfully regardless of the outcome of the decision. This is particularly apparent in the present case, for either including or excluding the Old Farm Area will significantly alter the area of Petitioner's landfill that is subject to the closure and post-closure requirements of the regulations.
 
 The Administrator concluded:
 
 21
 Therefore, even though ... [Northside] has stated that it does not object to the denial of its permit, I am persuaded that the matter ... [Northside] is raising is such an integral part of the permit decision that it is the kind of matter which can be reviewed under Sec. 124.19.
 
 
 22
 The Administrator also observed that "[t]here is no review as of right from the Region's determination." Rather, "[40 C.F.R. Sec. 124.19] clearly provides that ... permits will not be reviewed unless the Petitioner is able to show that the permit determination is clearly erroneous or involves an exercise of discretion or policy which is important and which should be reviewed as a discretionary matter." The Administrator then concluded that, although the sort of issue Northside raised was within the ambit of 40 C.F.R. Sec. 124.19, Northside "has not sustained its burden of showing that the permit determination is either clearly erroneous or involves an exercise of discretion or policy which warrants discretionary review."
 
 
 23
 On April 19, 1980, Northside filed a motion to reconsider with the Administrator, in which it noted that:
 
 
 24
 [T]he issue as to whether the Old Farm Area is a part of the Part A interim site is presently being litigated before a hearing officer of the Indiana Environmental Management Board.... Therefore, the Region's decision, as confirmed by the Administrator's recent Order, has ruled upon an issue which the U.S. Environmental Protection Agency has delegated to the State [Environmental Management Board].... This results in a denial of both procedural and substantive due process of law and affords the Petitioner no hearing at any time on the administrative determination of this issue.
 
 
 25
 On July 2, 1985, before the Administrator had ruled on the motion for reconsideration, Northside filed a petition for review with this court.
 
 
 26
 On November 27, 1985, approximately two days before briefs were to be filed with this court in support of Northside's petition for review, the Administrator denied Northside's motion for reconsideration. Although the effect of his order was to affirm his initial order, the Administrator adopted a completely different rationale on reconsideration by holding that, because Indiana had been granted authority pursuant to 42 U.S.C. Sec. 6926 to conduct closure proceedings for interim status permits, the comments in the Administrator's initial order regarding the scope of closure (and those comments made by the EPA and the Regional Administrator in the permit denial proceeding itself) "are without legal effect." In addition, the Administrator also noted that a parcel considered part of the facility for the purposes of a permit application need not automatically undergo closure upon a denial of the permit application.
 
 II
 A. Timeliness of Petition for Review
 
 27
 Northside's petition for review raises a number of jurisdictional issues; some have been considered by the parties, others have not. The first question we must decide is whether this court has jurisdiction under 42 U.S.C. Sec. 6976(b), the judicial review provision for the Solid Waste Disposal Act, to entertain Northside's petition. Section 6976(b) provides that a petition for review must be filed with this court within ninety days from the date of the Administrator's action in issuing, denying, modifying, or revoking a permit. Northside filed the instant petition for review on July 2, 1985. This was within ninety days of the Administrator's order of April 2, 1985 denying Northside review of Region V's order, which rejected Northside's Part B application. Northside had, however, on April 19, 1985, filed a motion requesting that the Administrator reconsider his order of April 2. It was not until November 27, 1985, some five months later, that the Administrator denied the reconsideration motion.[2] Northside did not, however, amend its original petition to reflect the Administrator's denial of its motion for reconsideration, which became the final administrative order on its Part B application.
 
 
 28
 On December 5, 1985, the Administrator filed a motion with this court requesting to amend the certified list of documents constituting the administrative record under review to include the November 27 order. Northside objected to the motion. On December 12, 1985, we issued an order stating that the Administrator's motion would be considered with the merits of Northside's petition. Following our order, Northside again took no action to amend its petition for review. Oral argument on Northside's petition was held on April 4, 1986, well over ninety days after the November 27, 1985, order denying reconsideration.
 
 
 29
 The limitation period set forth in Sec. 6976(b) is jurisdictional, see Arch Mineral Corp. v. Director, 798 F.2d 215, 216 (7th Cir.1986); Natural Resources Defense Council v. NRC, 666 F.2d 595, 602 (D.C.Cir.1981), and hence, we must consider the timeliness and sufficiency of Northside's petition, whether the parties have raised the issue or not. See Bender v. Williamsport Area School District, --- U.S. ---, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986); Christianson v. Colt Industries Operating Corp., 798 F.2d 1051, 1055 (7th Cir.1986); Foster v. Center Township, LaPorte County, 798 F.2d 237, 241 (7th Cir.1986). We shall then determine whether Northside's petition for review was premature when filed on July 2, 1985, and hence, insufficient to invoke our jurisdiction under Sec. 6976(b). By the same token, if we find that the petition was not premature when filed, we must decide whether Northside's failure to amend the petition to reflect the Administrator's final order affected our jurisdiction.
 
 
 30
 In reviewing a petition challenging an award of benefits under the Black Lung Benefits Act, codified as amended at 30 U.S.C. Secs. 901-960, we recently held that "a petition for review ... is timely if filed within sixty days of the ... [Benefits Review] Board's denial of a timely motion for reconsideration." Arch Mineral, 798 F.2d 215, 219 (emphasis added). In Arch Mineral, we noted that "[a] clear majority of the cases involving appellate review of administrative decisions hold that, where the applicable statute and administrative regulations are silent, the filing of a motion for reconsideration suspends the time for filing a petition for review." Id., at 375.
 
 
 31
 Nevertheless, Arch Mineral involved a statutory scheme of judicial review quite different than that presented in the instant case. 42 U.S.C. Sec. 6976(b) provides that judicial review of the Administrator's actions "shall be in accordance with sections 701 through 706 of Title 5," that is, the Administrative Procedure Act. Section 704 provides that "[e]xcept as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for ... any form of reconsideration." Thus, by its terms, "[t]he Administrative Procedure Act explicitly permits [a] judicial appeal and [a] request for agency reconsideration to be pursued simultaneously." American Trucking Associations, Inc. v. ICC, 697 F.2d 1146, 1148 n.* (D.C.Cir.1983) (Scalia, J.). We hold, therefore, that Northside's petition for review, which was filed within ninety days of the Administrator's initial order denying review, was timely under Sec. 6976(b) and thus sufficient to invoke our jurisdiction.[3] See also Selco Supply Co. v. EPA, 632 F.2d 863, 865 (10th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981) (motion to reconsider does not toll sixty-day limit under 7 U.S.C. Sec. 136n(b), which governs judicial review of EPA orders under the Federal Insecticide, Fungicide and Rodenticide Act, codified as amended at 7 U.S.C. Secs. 135-136y).
 
 
 32
 In addition, we grant the Administrator's motion to amend the certified list of documents constituting the record on the instant petition to include the Administrator's order on reconsideration. This, however, raises the question whether Northside should have amended its original petition to reflect the Administrator's order on reconsideration. In our opinion, it was unnecessary for Northside to have done so. As noted above, Sec. 704 permits the judicial review and administrative reconsideration of an agency's order to occur simultaneously. Once our jurisdiction has been properly invoked by a petition for review, it makes little sense to require an amendment to the petition to preserve that jurisdiction only because the agency has ruled on the motion for reconsideration. In North American Telecommunications Association v. FCC, 751 F.2d 207, 209 (7th Cir.1984) (per curiam), we noted "[t]he presumption in favor of judicial reviewability of agency action ... (on which, see, e.g., Abbott Laboratories v. Gardner, 387 U.S. 136, 140, [87 S.Ct. 1507, 1511, 18 L.Ed.2d 681] (1967)), implies to us that procedural rules should not lightly be interpreted to prevent a party from obtaining judicial review." We noted also that "the action of this court in accepting the transfer of the petition from [another federal circuit] may have lulled NATA [the petitioning party] into thinking that it had not filed its notice of appeal prematurely." Id. Our action in ordering that the Administrator's motion seeking to amend the scope of the administrative record be considered with the merits of Northside's petition might have "lulled" Northside into thinking that its petition need not be amended to reflect that order to sustain our jurisdiction. Insofar, then, the reasoning of Citizens State Bank is equally applicable here. Cf. Bernstein v. Lind-Waldock & Co., 738 F.2d 179, 182-83 (7th Cir.1984); Textor v. Board of Regents, 711 F.2d 1387, 1390-91 (7th Cir.1983).
 
 B. Standing and Ripeness
 
 33
 Northside asks this court to "reverse ... [the Administrator's order denying review], ... the Region's permit denial, [and the] interim status ... and closure determination[s], ... and [to] order ... [the Administrator] to hold a formal evidentiary hearing on said permits and closure, utilizing the Federal Rules of Evidence and the Administrative Procedure Act."[4] Northside contends that observations made by the Region V Administrator in his order denying Northside's Part B application incorrectly indicated that hazardous waste had been disposed of in areas of Northside's facility other than the East Farm. Northside also contends that the Region V Administrator's conclusion that Northside's entire facility was subject to closure proceedings was based on inaccurate drawings and photographs of Northside's facility. It is Northside's position that a formal evidentiary hearing before the EPA would afford Northside an opportunity to introduce evidence of the actual extent of waste disposal and of the property within its facility properly encompassed by its Part A permit application. This, Northside concludes, would allow the EPA to redetermine the scope of closure on the basis of accurate information.
 
 
 34
 The Administrator counters that because Northside did not dispute the denial of its Part B application (nor the termination of its interim status) before the EPA, and that because the State of Indiana, pursuant to 42 U.S.C. Sec. 6926, has the sole authority to conduct proceedings relating to, and to rule on hazardous waste closure plans, Northside does not have standing to challenge the comments relating to closure that were made by the Region V Administrator in his order. In essence, the Administrator argues that because the State of Indiana, not the EPA, has the authority to determine the scope of closure proceedings in Northside's case, the disputed statements are "without legal effect." Hence, the Administrator concludes that Northside cannot demonstrate that it has suffered, or that there is an immediate danger that it will suffer, a direct personal injury as a result of the comments made by the Region V Administrator in his order denying Northside's Part B application, even if those comments are inaccurate.
 
 
 35
 Article III of the Constitution limits the power of the federal judiciary to the resolution of "cases" and "controversies." Diamond v. Charles, --- U.S. ---, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986); Bender v. Williamsport Area School District, --- U.S. ---, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); Flast v. Cohen, 392 U.S. 83, 94-101, 88 S.Ct. 1942, 1949-53, 20 L.Ed.2d 947 (1968); see also Foster v. Center Township of LaPorte County, 798 F.2d 237, 240 (7th Cir.1986). Although the question of standing encompasses a number of prudential considerations, see Foster, at 241 n. 9, in its constitutional dimension it is a component of the case-or-controversy requirement and, as such, bears on the power of a court to entertain a party's claim. Valley Forge, 454 U.S. at 471, 102 S.Ct. at 757; Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 262 n. 8, 97 S.Ct. 555, 561 n. 8, 50 L.Ed.2d 450 (1977); Foster, at 241; Block v. Meese, 793 F.2d 1303, 1307 (D.C.Cir.1986). The analysis of standing under Article III focuses on the party bringing a claim, not on the claim itself. Valley Forge, 454 U.S. at 484, 102 S.Ct. at 765; Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); Foster, at 241.
 
 
 36
 In Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758, the Supreme Court set forth three requirements as the "irreducible minimum" that must be present before a party is said to have standing before a federal court: (1) the party "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 66 L.Ed.2d 66 (1979)); (2) the injury "fairly can be traced to the challenged action," of the defendants (quoting Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)); and (3) the injury "is likely to be redressed by a favorable decision," (quoting Simon, 426 U.S. at 41, 96 S.Ct. at 1925). The constitutional analysis is not altered by the fact that this action was brought under the judicial review provisions of the Solid Waste Disposal Act. See, e.g., Center for Auto Safety v. N.H.T.S.A., 793 F.2d 1322, 1328-31 (D.C.Cir.1986); Bethlehem Steel Corp. v. EPA, 782 F.2d 645, 651 (7th Cir.1986). As the Supreme Court observed in Valley Forge, 454 U.S. at 487 n. 24, 102 S.Ct. at 766 n. 24, "[n]either the Administrative Procedure Act, nor any other congressional enactment, can lower the threshold requirements of standing under Art. III."
 
 
 37
 The argument Northside advances to establish standing to bring the instant petition for review is somewhat fragmented, but nevertheless may fairly be reduced to the following contentions: (1) the EPA's disputed remarks mandate the closure of Northside's entire facility, even for the purposes of non-hazardous waste disposal, and have hence, caused Northside injury; (2) Northside has standing because it is appealing from the EPA's termination of its interim status; (3) Northside has standing because it is appealing from the EPA's denial of its Part B application; and (4) because the Indiana environmental agency has already in part accepted, and may continue to accept the EPA's recommendations as to the closure of Northside's facility without an independent exercise of its discretion and judgment, the remarks will have the effect of denying Northside an opportunity to litigate this matter before the Indiana agency. We shall consider each of these contentions in turn. As we explain below, the first three arguments, upon analysis, fail to show that Northside has standing, and the last argument, although it affords Northside standing, is not ripe for judicial resolution.
 
 1. Closure of Entire Facility
 
 38
 For the purposes of our decision, we must accept as true all material allegations of Northside's petition for review, and it will suffice if these allegations show that Northside has standing. See, e.g., Village of Arlington Heights, 429 U.S. at 264 n. 9, 97 S.Ct. at 262 n. 9; Block v. Meese, 793 F.2d at 1307. Northside first maintains that as a result of the Region V Administrator's remarks, the entire facility, including areas in which Northside claims no hazardous wastes were disposed after the relevant statutory cut-off date, must undergo closure under Part 265, and that it will be unable to dispose of non-hazardous waste on any portion of its facility.
 
 
 39
 Northside's argument, however, fails to account for the fact that the State of Indiana has received authorization, pursuant to 42 U.S.C. Sec. 6926, to determine the closure requirements for any facility in that state whose interim status has been terminated by the EPA. See 40 C.F.R. Secs. 265.1(c)(4); 271.121(b). Once the state agency has received authorization for its program, it shall "carry out such program in lieu of the Federal program." 42 U.S.C. Sec. 6926(a). The EPA simply does not have the legal authority to determine whether, for what purposes, or which areas of Northside's facility must be closed. See 40 C.F.R. Sec. 265.1(c)(4). The State of Indiana alone is responsible for these determinations. Even if the EPA is dissatisfied with, for example, the enforcement action taken by a state against a specific hazardous waste disposal facility, or the settlement agreement reached between the state and the facility, so long as the state has exercised its judgment in a reasonable manner and within its statutory authority, the EPA is without authority to commence an independent enforcement action or to modify the agreement. Cf. Shell Oil Co. v. Train, 585 F.2d 408, 414 (9th Cir.1978) (EPA recommendation that state deny NPDES variance request constituted advice to state, and was not reviewable in federal court). Hence, in and of itself, the fact that the EPA made comments on the scope of closure in the course of denying Northside's Part B permit application does not constitute an injury to Northside.
 
 
 40
 Nor can it be said that the disputed remarks preclude the Indiana agency from deciding the issue of which areas of Northside's facility must be closed. It is only when "an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," that the findings of the agency are entitled to preclusive effect. See University of Tennessee v. Elliott, --- U.S. ---, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986) (quoting United States v. Utah Construction & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (emphasis added)). In the instant case, the disputed remarks of the EPA arose as responses to comments made by a representative of Northside at the public hearing held on the denial of Northside's Part B application. Participants at the hearing were allotted only five minutes to comment upon the proposed permit denial. Hence, it is clear that the parties were not given a full and fair opportunity to litigate the issue of which areas of Northside's facility were subject to closure. More important, because, as we noted above, the EPA did not have the authority to make closure findings and determinations, these issues were not properly before it. Hence, Northside cannot claim that it has been injured by the allegedly preclusive effect of the EPA's statements. Brotherhood of Locomotive Engineers v. ICC, 761 F.2d 714 (D.C.Cir.1985).
 
 
 41
 Northside argues in its reply brief that the Indiana environmental agency is not alone responsible for developing a closure plan for Northside's facility. Northside states that the Indiana agency informed it "that Northside is subject to the Phase II closure requirements set forth in 40 C.F.R. Part 264, which the state is not authorized to administer." On January 31, 1986, however, Indiana received final authorization, and "now has the responsibility for permitting treatment, storage and disposal facilities within its borders and carrying out the other aspects of the [Act]." 51 Fed.Reg. 3954 (January 21, 1986). Hence, Indiana now has authority under Phase II.
 
 
 42
 Nevertheless, Indiana's final authorization "is subject to the limitations on its authority imposed by the Hazardous and Solid Waste Amendments of 1984 (Pub.L. 98-616, November 8, 1984)." Id. That is, "new requirements imposed by the [1984 amendments] take effect in authorized States ... [and the] U.S. EPA is directed to carry out those requirements and prohibitions ..., including the issuance of full or partial Federal permits, until the State is granted authorization to do so." Id.; see also 42 U.S.C. Sec. 6926(g)(1). Thus, "[a]s a result of ... [the amendments], there will be a dual State/Federal regulatory program in Indiana." 52 Fed.Reg. 3954; see also 42 U.S.C. Sec. 6926(c)(4). However, "[t]o the extent the authorized state program is unaffected by ... [the amendments], the State program is authorized to operate in lieu of the Federal program." 51 Fed.Reg. 3954; see also 42 U.S.C. Sec. 6926(c)(4).
 
 
 43
 Northside contends that its facility, and hence, its closure plan falls within the ambit of the 1984 amendments. Indeed, Northside notes that the Indiana agency advised it in a letter written July 11, 1985, that:
 
 
 44
 [B]ecause of your delay in submitting a Closure/Post-Closure Plan, you have become subject to the requirements of the Hazardous and Solid Waste Amendments of 1984. Because EPA is implementing the requirements of that statute, they are the only ones who can integrate the new requirements into your ... plan.
 
 
 45
 We note that this letter was written before the EPA issued a clarification of the effect of the 1984 amendments on July 15, 1985, and before the Indiana environmental agency received Phase II authorization on January 31, 1986.
 
 
 46
 In its amended form, 42 U.S.C. Sec. 6925(i) provides:
 
 
 47
 The standards concerning groundwater monitoring, unsaturated zone monitoring, and corrective action, which are applicable under Section 6924 of this title to new landfills, surface impoundments, land treatment units, and waste-pile units required to be permitted under subsection (c) of this section shall also apply to any landfill, surface impoundment, land treatment unit, or waste-pile unit qualifying for the authorization to operate under subsection (e) of this section which receives hazardous waste after July 26, 1982.
 
 
 48
 (emphasis added)
 
 
 49
 In addition, 42 U.S.C. Sec. 6926(c)(4) provides:
 
 
 50
 In the case of a State permit program for any State which is authorized under subsection (b) of this section or under this subsection, until such program is amended to reflect the amendments made by the Hazardous and Solid Waste Amendments of 1984 and such program amendments receive interim or final authorization, the [EPA] Administrator shall have the authority in such State to issue or deny permits or those portions of permits affected by the requirements and prohibitions established by the Hazardous and Solid Waste Amendments of 1984. The Administrator shall coordinate with States the procedures for issuing such permits.
 
 
 51
 (emphasis added)
 
 
 52
 Thus, insofar as Northside falls within the purview of the 1984 amendments, and hence, must satisfy the closure standards found at Part 264, instead of at Part 265, Indiana is authorized to administer these regulations. Yet, insofar as portions of Northside's property, and hence, of Northside's closure plan are affected by the 1984 amendments, Indiana must coordinate closure with the EPA. Pursuant to 42 U.S.C. Sec. 6925(i), this would include standards concerning groundwater monitoring, unsaturated zone monitoring, and the necessary corrective action relating thereto.
 
 
 53
 Northside has not indicated, however, what other portions, if any, of its closure plan are affected by the 1984 amendments. More important, Northside has not suggested, nor do we find any reason on the basis of the record before us to assume, that the determination in areas in which hazardous waste has been disposed after July 26, 1982, the relevant statutory cut-off date, is entrusted to the EPA as opposed to the Indiana agency. We are also not unmindful that Northside is challenging the EPA's remarks regarding the disposal of hazardous waste on the Old Farm Area after November 19, 1980, and not disposal on the East Farm after July 26, 1982. Therefore, in this regard, the 1984 amendments are not relevant to Northside's challenge. Northside has not claimed, and there is no reason to assume, that the 1984 amendments give the EPA authority to determine the scope of closure. The 1984 amendments provide for coordinate authority over specific and limited aspects of hazardous waste disposal pending an approved state program. The amendments do not preempt that part of an existing state program that is relevant to the matters Northside seeks to challenge on its petition for review. Those amendments do not aid Northside in establishing that it has standing to challenge the EPA's remarks regarding the scope of closure and the areas of its facility where hazardous waste was disposed after November 19, 1980. Thus, on the basis of the record before us, the 1984 amendments are not relevant to the disposition of Northside's petition for review.
 
 2. Termination of Interim Status
 
 54
 At times Northside characterizes its petition as a challenge to the denial of its Part B application and to the termination of its interim status, not merely a challenge to the EPA's remarks concerning the scope of closure. Northside asserts that it was entitled to a formal evidentiary hearing prior to the Administrator's action on its application and interim status. Insofar as Northside characterizes its petition as a challenge to the termination of its interim status, its argument is unavailing. Section 6976(b) grants us jurisdiction only to review certain actions of the Administrator in regard to a claimant's "permit." Yet, although it imposes the same obligations on a hazardous waste management facility to comply with operational requirements as a facility actually issued a permit, 42 U.S.C. Sec. 6925(e); 40 C.F.R. Sec. 265.1(b), interim status is not considered a "permit" within the meaning of the judicial review provision (Sec. 6976(b)), and we do not have jurisdiction to review the termination of that status.[5] Hempstead County and Nevada County Project v. EPA, 700 F.2d 459, 462 (8th Cir.1983).
 
 3. Denial of Part B Application
 
 55
 Northside's attempt to characterize its petition as a challenge to the denial of its Part B application for a hazardous waste management permit is equally unpersuasive. First, Northside did not press this argument before either the Region V Administrator or the Administrator. Indeed, the record reflects that Northside, on several occasions, expressly disavowed that it was seeking review of the permit denial.[6] It is clear from the record that Northside contested only the Region V Administrator's comments concerning the scope of closure and the areas of Northside's facility where hazardous wastes had been disposed of after November 19, 1980. Second, (and more important for the matter of Northside's standing before this court), even were we to order the EPA to hold an evidentiary hearing (a remedy that we cannot grant Northside), it would not redress Northside's claimed injury. By asking for an evidentiary hearing in the guise of a challenge to the permit denial, Northside in effect is asking us to order the EPA to make findings and reach conclusions regarding the scope of closure that the EPA simply does not have the authority to make. It is axiomatic, however, that a party challenging the agency action "is required to show a substantial possibility that the requested relief would benefit him in some perceptible, tangible fashion." See, e.g., Public Citizen v. Lockheed Aircraft Corp., 565 F.2d 708, 715 (D.C.Cir.1977). Northside may not rely upon the "remote possibility, unsubstantiated by allegations of fact, that ... [its] situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." Warth v. Seldin, 422 U.S. at 507, 95 S.Ct. at 2209. Hence, the fact that Northside's claimed injury, viz., being subject to an overinclusive closure order due to the EPA's action, cannot be redressed by the relief Northside seeks leads to the conclusion that Northside does not have standing before this court to challenge the EPA's remarks made during permit denial proceedings. Larsen v. Valente, 456 U.S. 228, 243 n. 15, 102 S.Ct. 1673, 1682 n. 15, 72 L.Ed.2d 33 (1982); Foster, 798 F.2d 237, 243; see also Center for Auto Safety, 793 F.2d at 1334.
 
 
 56
 4. Preclusion of State Agency's Consideration
 
 
 57
 In support of its petition for review, Northside also argues that the state agency will do nothing more than "rubber stamp" the EPA's recommendations on the scope of closure for Northside's facility. The record does reflect that, in developing a closure plan for Northside's facility, the state agency has in large part adopted the EPA's recommendations. Of course, the fact that the state agency reaches the same, or substantially the same, findings and conclusions as the Administrator is not, in and of itself, indicative of an injury to Northside arising out of the EPA's remarks made during Northside's permit proceedings. Nor is the EPA's conceded role in advising the state agency and cooperating with it in formulating a closure plan either necessarily, or even probably, improper. Indiana's authorization to conduct closure proceedings does not in any way preclude cooperation with the EPA. It is unwise to impose an artificial barrier between the EPA and the state in these matters, because to do so would lead to a needless duplication of efforts at the risk of decreasing the accuracy of the state's findings and actions. When the integrity of the environment and the health of the general public are at stake, such a risk cannot be accepted lightly. Moreover, even if the state's factual findings, and hence, its closure plan for Northside, prove to be unsupported by substantial evidence in the record, this does not entail, nor even suggest, that the EPA was improperly enmeshing itself in the state proceedings.
 
 
 58
 Even accepting, for the sake of argument, that the EPA's role in developing a closure plan for Northside's facility was in excess of the EPA's statutory authority, (and although this would suffice to confer standing on Northside) the effect that may have on Northside is, at the present time, speculative at best. Our intervention at this point would be premature and unwarranted. It is well settled that a court should refrain, "through [the] avoidance of premature adjudication, from entangling ... [itself] in abstract disagreements over administrative policies, and ... [that a court should] protect ... agencies from judicial interference until an administrative decision has been formalized and its effect felt in a concrete way by the challenging part[y]." See Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); Citizens for a Better Environment v. Costle, 617 F.2d 851, 853-54 (D.C.Cir.1980). In addition, under the circumstances of this case, there is no hardship to Northside in withholding consideration on this matter. Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515. At oral argument, Northside conceded that it would be able to present its position before the state agency. Northside also has not suggested that the procedural safeguards afforded it at the state proceedings will be inadequate. In addition, once the state has decided upon a closure plan, review of that plan is available. Hence, by withholding judgment on this matter, we cannot be said to have insulated the issues Northside raises from review. Abbott Laboratories, 387 U.S. at 136, 87 S.Ct. at 1507; United States Brewers Association v. EPA, 600 F.2d 974, 979 (D.C.Cir.1979). In conclusion, even accepting as true Northside's allegations that the Indiana environmental agency will not exercise independent judgment in developing a closure plan for Northside's facility, which would be sufficient to confer standing, until a final administrative decision is reached, Northside's claim is not ripe for judicial resolution.
 
 
 59
 Distilled to its essence, Northside's argument asks us to either determine the proper scope of closure or to order the EPA to hold a formal evidentiary hearing for it to do so. Neither is a remedy that we have the authority to grant. We do, however, caution the Administrator against commenting on the scope of closure in a case such as this where a state agency has the sole authority to decide such matters. Even though the Administrator's comments in these regards are not legally binding on the state agency, they may give rise to delicate questions of the state agency's exercise of independent judgment. The Administrator must bear in mind the sensitive relationship existing between it and state agencies.
 
 III
 
 60
 For the reasons stated above, Northside's petition for review is
 
 
 61
 DISMISSED.
 
 
 
 [1]
 Under the 1984 amendments to the Act, a facility that had been granted interim status before November 8, 1984, shall have that status terminated on November 9, 1985, should the facility fail to apply for a final determination regarding the issuance of a permit pursuant to 42 U.S.C. Sec. 6925(c) (Part B application) before November 9, 1985, and to certify that it is in compliance with all applicable groundwater monitoring and financial responsibility requirements. 42 U.S.C. Sec. 6925(e)(2) (as amended by P.L. No. 98-616, 98 Stat. 3221)
 
 
 [2]
 In the interim, both Northside and the Administrator had filed a number of motions (not concerning the issues of jurisdiction and standing) in this court in regard to Northside's petition for review
 
 
 [3]
 In Arch Mineral Corp. v. Director, No. 84-2633, 798 F.2d 215, 219 (7th Cir.1986), we noted that "[i]t is obviously wasteful of the resources of the courts to burden them with objections to administrative action which may be obviated by agency action on reconsideration." Nevertheless, citing Selco Supply Co. v. EPA, 632 F.2d 863, 865 (10th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981), we noted that, in the context of environmental legislation, the need for "prompt decisionmaking procedures that could better prevent unnecessary injury" must be taken into account. Arch Mineral, at 219. We cannot be unmindful at this juncture that the EPA has expressed concern about the effects of Northside's hazardous waste disposal on the water supply of the City of Indianapolis. Thus, the need for "prompt decisionmaking procedures" is especially strong in the instant case. In addition, under the statutory provisions relevant here, unlike those cases cited in Arch Mineral, there is no prescribed period in which the agency must pass upon a motion for reconsideration. See, e.g., 49 U.S.C. Sec. 10322(g)(2). In theory then, the wait for administrative action on a motion for reconsideration could be indefinite. Nor are we faced with a case in which a motion for reconsideration is the only available channel to present matters of general importance for plenary consideration by, for example, the entire Interstate Commerce Commission (as opposed to inferior panels). See B.J. McAdams v. ICC, 551 F.2d 1112, 1114-15 (8th Cir.1977)
 
 
 [4]
 In the alternative, Northside requests that this court "hold that the Northside property subject to closure and post-closure requirements of 40 CFR Part 265 (Subpart G) is limited to the twelve acres located in its East Farm utilized for the disposal of ... hazardous waste between November 19, 1980, and January 24, 1983." Even were we to conclude that the EPA has the authority to determine the scope of closure proceedings for interim status facilities (which we do not) and that the Region V's finding that hazardous waste had been disposed of in the Old Farm Area as well as the East Farm after the statutory cut-off date was unsupported by substantial evidence (about which we express no opinion), we may not decide de novo which area within the East Farm should be closed. Such a determination rests in the first instance with the appropriate agency and we may review that agency's decision to determine whether it is supported by substantial evidence on the record. As we recently held in Brock v. Dow Chemical, U.S.A., 801 F.2d 926, 931 (7th Cir.1986), "unless a matter crucial to ... [an administrative] order falls outside the permissible bounds of choice for an agency, such that we can find it proper or improper as a matter of law, we may not uphold [or review] an order on the basis of facts or reasoning upon which the ... [agency itself] did not expressly rely, even if such facts or reasoning are supported by substantial evidence in the record." See also Bowen v. American Hospital Assoc., --- U.S. ---, 106 S.Ct. 2101, 2113, 90 L.Ed.2d 584 (1986); FTC v. Indiana Federation of Dentists, --- U.S. ---, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986); SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); NLRB v. Indianapolis Mack Sales & Service, Inc., 802 F.2d 280, 284 (7th Cir.1986). Hence, we would have to remand to the appropriate agency for a determination as to which areas of Northside's facility must be closed. Yet, because we hold that Northside has not been (yet) injured by the disputed comments made by the EPA regarding the closure of its facility, and hence, that the petitioner's challenge is not ripe for judicial resolution, we will not reach the merits of Northside's argument in this regard
 
 
 [5]
 Northside also argues that it has a property interest in continuing to operate under interim status, and that the termination of that status without a formal evidentiary hearing constitutes a deprivation of property without due process of law. This argument is unavailing. The grant of interim status to a hazardous waste management facility is expressly provisional and cannot be said to create a "claim of entitlement" to the status, see, e.g., Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); Ruckelshaus v. Monsanto, 467 U.S. 986, 104 S.Ct. 2862, 2873, 81 L.Ed.2d 815 (1984); Campbell v. Miller, 787 F.2d 217, 222-23 (7th Cir.1986). Thus, Northside does not have a protected property interest in the interim status
 
 
 [6]
 It is true that Northside, in its petition to the Administrator for review of the Region V administrator's order, stated that, if its petition must be characterized as an appeal from the permit denial itself in order to invoke appellate administrative review, then the Administrator should so characterize it. Yet, this arose in the context of Northside's argument that the Region V administrator did not have the authority to make the disputed comments in its order denying the Part B application. In effect, Northside argued that, if the comments were appropriately made in a permit denial proceeding, then in fairness it should have an opportunity to challenge the statements before the EPA, for they would have an adverse effect on Northside's position in the state closure proceedings. Yet, we agree with Northside that the EPA did not have the legal authority to make these comments. What is important is that Northside did not, before the Administrator, base its claim to an evidentiary hearing on the argument that its Part B application was improperly denied